PRESENT: Kinser, C.J., Goodwyn, Millette, McClanahan and Powell, JJ., and Koontz and Lacy, S.JJ.

THE FALLS CHURCH, a/k/a
THE CHURCH AT THE FALLS
- THE FALLS CHURCH

                                        OPINION BY
 v.  Record No. 120919          JUSTICE CLEO E. POWELL
                                      April 18, 2013

THE PROTESTANT EPISCOPAL CHURCH
IN THE UNITED STATES OF AMERICA,
ET AL.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

This appeal has its origin in a protracted and complex dispute between the plaintiffs, the Protestant Episcopal Church in the Diocese of Virginia (the "Diocese") and the Protestant Episcopal Church in the United States of America ("TEC"), and the defendants, seven local congregations including The Falls Church, the appellant in the present case.  In this appeal, we are asked to consider whether the trial court properly applied neutral principles of law in deciding the ownership of certain disputed church property, whether that application was constitutional, and whether the trial court, after applying neutral principles of law, granted the proper relief.  In their assignment of cross-error, TEC and the Diocese ask us to consider whether the trial court erred in its application of Code § 57-7.1.

I. BACKGROUND

Many of the facts in this case were related in exacting detail in prior proceedings before this Court. See Protestant Episcopal Church v. Truro Church, 280 Va. 6, 694 S.E.2d 555 (2010). Therefore, due to the extensive nature of the proceedings below, we will recite only the facts necessary for our resolution of the dispositive issues in this case.

The Falls Church was founded in 1732 as one of two congregations in Truro Parish. Construction of a church on the property conveyed to the parish was completed in 1769. TEC is a hierarchical denomination founded in 1789. Id. at 13, 694 S.E.2d at 558. The Diocese is one of the geographical dioceses within TEC. Id. at 15, 694 S.E.2d at 559. Although it existed prior to the founding of TEC or the Diocese, The Falls Church petitioned to be a part of the Diocese and TEC in 1836. At the 1836 Annual Convention, the Diocese accepted The Falls Church's petition.

Following a long-standing conflict within TEC that arose in 2003, the congregation of The Falls Church overwhelmingly voted to disaffiliate from TEC and the Diocese on December 17, 2006. The Falls Church and six other congregations in the Diocese (collectively the "CANA congregations") subsequently filed petitions pursuant to Code § 57-9(A), which was the subject of this Court's opinion in Truro Church.

2

Shortly after the CANA congregations filed their petitions, TEC and the Diocese filed complaints asserting that all personal and real property held by the CANA congregations was actually held in trust for TEC and the Diocese. In their complaint, TEC and the Diocese asserted that they directed the trustees of the CANA congregations to transfer the property to the Diocesan Bishop, but the CANA congregations had refused to do so. Both complaints requested that the CANA congregations be ordered to submit an accounting, be enjoined from further use, occupancy or alienation of the disputed property, and convey and transfer control of the property to the Diocesan Bishop. The complaint filed by the Diocese further requested that the trial court enter judgment declaring an improper trespass, conversion and alienation of real and personal property. The CANA congregations filed a counterclaim seeking a declaration that TEC and the Diocese had no interest in the disputed property occupied by the CANA congregations, and asserting claims for unjust enrichment and for imposition of a constructive trust.

After a trial on the congregations' Code § 57-9(A) petitions, the trial court granted the petitions and dismissed the complaints filed by TEC and the Diocese as legally moot. This Court reversed, and remanded the case with direction that the trial court reinstate TEC's and the Diocese's declaratory judgment actions and the CANA congregations' related

3

counterclaims.  Id. at 29, 694 S.E.2d at 567.  In so doing, we stated the trial court was to "resolve this dispute under principles of real property and contract law."  Id.

On remand, the trial court considered the complaints filed by TEC and the Diocese as well as the counterclaims filed by the CANA congregations.  Following a 22-day trial, the trial court ruled that TEC and the Diocese had contractual and proprietary interests in the property at issue, and enjoined the CANA congregations from further use of the property.  The trial court denied the entirety of the CANA congregations' counterclaims.

In a 113-page letter opinion, the trial court articulated its analysis of the dispute.  The trial court explained that it applied neutral principles of law by considering our statutes, the language of the deeds conveying the disputed property, the constitution and canons of TEC and the Diocese, and the dealings between the parties.  See Green v. Lewis, 221 Va. 547, 555, 272 S.E.2d 181, 185-86 (1980) ("we look to our own statutes, to the language of the deed conveying the property, to the constitution of the general church, and to the dealings between the parties"); Norfolk Presbytery v. Bollinger, 214 Va. 500, 505, 201 S.E.2d 752, 756-57 (1974) ("it is proper to resolve a dispute over church property by considering the statutes of Virginia, the express language in the deeds and the provisions of the constitution of the general church").

4

In considering the applicable statutes, the trial court found that the adoption of Code § 57-7.1 did not change the long-standing rule in Virginia that church property may not be held by a trustee for the general church, and only trusts for local congregations are recognized. Thus, the trial court found it unnecessary to address the applicability of Code § 57-7.1. The trial court further determined that Code § 57-15 allowed it to order the transfer of property only if the transfer was the wish of the constituted church authorities of a hierarchical church.

Turning to its examination of the relevant deeds, the trial court considered the eleven deeds connected with The Falls Church. In 1746, the first deed conveyed two acres to "the said Vestry of Truro parish." The second deed is to the "trustees of the Episcopal Church, known and designated as the 'Falls Church.'" The third deed is to "Trustees for the Falls Church Episcopal Church," and the fourth is to "Trustees of the Falls Church." The fifth and sixth deeds are both to "Trustees of The Falls Church, Falls Church, Virginia." The seventh through eleventh deeds are all to "Trustees of the Falls Church (Episcopal)." The trial court found that the fact that most of the deeds refer to the church as Episcopal was an indication that the designated cestui que trust was a unit or component of TEC. Relying on the circumstances of the times during which the

5

deeds were executed, the trial court found that a reasonable grantor would have understood that property conveyed to a local Episcopal church would not be removed from the denomination without TEC's or the Diocese's consent.

In looking at the constitution and canons of the church, the trial court cited provisions stating that each congregation was bound by the constitution and canons of the general church and must acknowledge the jurisdiction of the Bishop; all clergy must affirm they "conform to the Doctrine, Discipline, and Worship of the Episcopal Church" to be ordained; all congregations use the Book of Common Prayer; Bishops must regularly visit parishes to examine the state of the churches; and congregations must participate in the Diocesan health care plan, contribute to the Church Pension Fund, and purchase fire, casualty and workers' compensation insurance. The trial court also noted property canons which prohibited the congregations from alienating consecrated property without the consent of the Diocese and allowed the Diocese to declare property abandoned if it ceased to be used by a congregation of TEC and the Diocese. The trial court concluded that TEC and the Diocese exercised pervasive dominion, management, control, supervision and authority over local church property, in a manner traditionally associated with ownership and possession.

6

Finally, in considering the course of dealings between the parties, the trial court cited the fact that the churches became members of TEC and the Diocese in accordance with the rules of the Diocese, were known in the community as Episcopal churches, sought consent from the Diocese to encumber property, were served by ordained Episcopal priests, used the Book of Common Prayer, contributed financially to the Diocese and the Church Pension Fund and were visited every year between 1934 and 2005 by the Bishops of the Diocese.

Based on its consideration of neutral principles of law and examination of our statutes, the deeds, the constitutions and canons, and the course of dealings between the parties, the trial court found that TEC and the Diocese carried their burden of proving they had contractual and proprietary interests in the church property at issue. The trial court acknowledged that the congregations paid for, improved and managed the property on a daily basis, but found those actions were consistent with a hierarchical polity and were not dispositive of whether the CANA congregations or TEC and the Diocese were entitled to the property. The trial court also found that, under Code § 57-10, the personal property held by the CANA congregations followed the disposition of the real property and must also be turned over to the Bishop.

7

The trial court further stated that there was a point in time after which it was clear that donations by members of the CANA congregations were not contributions to Episcopal congregations. Therefore, the trial court adopted the date TEC and the Diocese filed the declaratory judgment actions, January 31, 2007, as the proper "point of demarcation," and ordered that all personal property acquired before that date be conveyed to the Diocese and all intangible personal property acquired after that date remain with the CANA congregations. Tangible personal property acquired after that date would be conveyed to the Diocese unless the CANA congregations could demonstrate that it was purchased with funds acquired after the date.

The Falls Church appeals.[1] TEC and the Diocese cross-appeal the trial court's ruling with regard to Code § 57-7.1.

II. COURT REVIEW OF CHURCH PROPERTY DISPUTES

The primary issue in this case is whether TEC and the Diocese have a proprietary interest in the real and personal property that was held by The Falls Church. See Code § 57-15; Norfolk Presbytery, 214 Va. at 503, 201 S.E.2d at 755. In its first assignment of error, The Falls Church claims that:

> The trial court erred in enforcing canon law, rather than "principles of real property and contract law" used in all

---

[1] None of the other six CANA congregations appealed the decision of the trial court.

8

cases, to award [TEC and the Diocese] a proprietary interest in [The Falls Church's] property and to extinguish [The Falls Church's] interest in such property, even though [The Falls Church's] own trustees held title and [The Falls Church] paid for, improved, and maintained the property.

Although it has been recognized that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes," Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449 (1969), it is well established that "there is no constitutional prohibition against the resolution of church property disputes by civil courts, provided that the decision does not depend on inquiry into questions of faith or doctrine." Norfolk Presbytery, 214 Va. at 503, 201 S.E.2d at 755.

"Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." Neither the State Constitution nor the First Amendment deprives church members of their right to resort to the courts for the protection of their property rights or their civil rights. The question is simply whether the court can decide the case by reference to neutral principles of law, without reference to issues of faith and doctrine.

9

Reid v. Gholson, 229 Va. 179, 187-88, 327 S.E.2d 107, 112 (1985) (citations omitted).

In Jones v. Wolf, 443 U.S. 595, 602 (1979), the United States Supreme Court held that "'a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith'" (quoting Maryland & Va. Churches v. Sharpsburg Church, 396 U.S. 367, 368 (1970) (Brennan, J., concurring) (emphasis omitted)). Referring to such secular approaches as "neutral principles of law," the Supreme Court explained:

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general - flexibility in ordering private rights and obligations to reflect the intentions of the parties.

Id. at 603.

As part of its explanation of the neutral principles of law, the Supreme Court noted that:

> Under the neutral-principles approach, the outcome of a church property dispute is not

> foreordained.  At any time before the
> dispute erupts, the parties can ensure, if
> they so desire, that the faction loyal to
> the hierarchical church will retain the
> church property.  They can modify the deeds
> or the corporate charter to include a right
> of reversion or trust in favor of the
> general church.  Alternatively, the
> constitution of the general church can be
> made to recite an express trust in favor of
> the denominational church.  The burden
> involved in taking such steps will be
> minimal.  And the civil courts will be bound
> to give effect to the result indicated by
> the parties, provided it is embodied in some
> legally cognizable form.

Id. at 606.

Virginia has long applied neutral principles of law when there is a dispute between a hierarchical church and a local congregation over the ownership of church property.  See Reid, 229 Va. at 188, 327 S.E.2d at 112; Green, 221 Va. at 555, 272 S.E.2d at 185; Norfolk Presbytery, 214 Va. at 507, 201 S.E.2d at 758.  We have held that the hierarchical church bears the burden of proving a proprietary interest[2] in the property at issue by demonstrating that the local congregation violated either "the express language of the deeds or a contractual obligation to the general church."  Norfolk Presbytery, 214 Va. at 507, 201 S.E.2d at 758.  In resolving church property disputes, we have

---

[2] A proprietary right or interest "is a right customarily associated with ownership, title, and possession.  It is an interest or a right of one who exercises dominion over a thing or property, of one who manages and controls."  Green, 221 Va. at 555, 272 S.E.2d at 186.

11

heretofore specifically limited our consideration to certain aspects of property and contract law. This limitation was necessitated only by the fact that, in Virginia, hierarchical churches were prohibited from relying on denominational trusts, whether express or implied. See Green, 221 Va. at 555, 272 S.E.2d at 185; Norfolk Presbytery, 214 Va. at 507, 201 S.E.2d at 758.

However, in their assignment of cross-error, TEC and the Diocese argue that the plain language of Code § 57-7.1 demonstrates that the General Assembly has repudiated Virginia's historical disdain for denominational trusts.[3] We will first address whether the trial court erred by holding that "[Code §] 57-7.1 did not change the policy in Virginia, which is that church property may be held by trustees for the local congregation, not for the general church."

A. CODE § 57-7.1

We have long recognized that, for the most part, express and implied trusts for hierarchical churches "are invalid under Virginia law." Norfolk Presbytery, 214 Va. at 507, 201 S.E.2d

---

[3] We recognize that, due to the posture of Truro Church, we were not required to consider TEC's and the Diocese's arguments regarding Code § 57-7.1. On remand, we specifically instructed the trial court to "resolve this dispute under principles of real property and contract law," Truro Church, 280 Va. at 29, 694 S.E.2d at 567, which it properly did. However, now the issue of the applicability of the Code § 57-7.1 is squarely before us and therefore we will address it.

at 754.  However, this limitation on denominational trusts is a creature of statutory law and, therefore, it is within the power of the General Assembly to narrow or even eliminate the limitation, should it so choose.  See Trustees of Asbury United Methodist Church v. Taylor & Parrish, Inc., 249 Va. 144, 152, 452 S.E.2d 847, 851 (1995) ("acquisition and ownership of property by churches are matters governed by statute.") (citing Article IV, § 14 of the Constitution of Virginia).[4]

In reviewing Code § 57-7.1, we are guided by well-established principles of statutory construction.  "When the language of a statute is clear and unambiguous, we are bound by the plain meaning of that language."  Industrial Dev. Auth. v. Board of Supervisors, 263 Va. 349, 353, 559 S.E.2d 621, 623 (2002).  Furthermore, "[i]n interpreting a statute, we presume that the General Assembly acted with full knowledge of the law

---

[4] In 1995, the last paragraph of Article IV, § 14 of the Constitution of Virginia stated: "The General Assembly shall not grant a charter of incorporation to any church or religious denomination, but may secure the title to church property to an extent to be limited by law."  (Emphasis added.)  This paragraph was removed by an amendment proposed and agreed to by the General Assembly at the 2005 Regular Session (2005 Acts ch. 950) and the 2006 Regular Session (2006 Acts chs. 68, 945), and ratified by the people at the general election held November 7, 2006.  Code §§ 57-7.1 through -17 demonstrate that, although the language referring to the method of securing church property has been removed, the General Assembly still intended for matters involving the acquisition and ownership of church property to be governed by statute.

in the area in which it dealt." Philip Morris USA Inc. v. Chesapeake Bay Found., Inc., 273 Va. 564, 576, 643 S.E.2d 219, 225 (2007). Finally, "statutory construction is a question of law which we review de novo." Smit v. Shippers' Choice of Va., Inc., 277 Va. 593, 597, 674 S.E.2d 842, 844 (2009).

Former Code § 57-7[5] specifically validated conveyances, devises and dedications of land "for the use or benefit of any

_____

[5] Former Code § 57-7 stated, in relevant part:
Every conveyance, devise, or dedication shall be valid which . . . has been made, and every conveyance shall be valid which hereafter shall be made of land for the use or benefit of any religious congregation as a place for public worship, or as a burial place, or a residence for a minister, or for the use or benefit of any church diocese, church, or religious society, as a residence for a bishop or other minister or clergyman who, though not in special charge of a congregation, is yet an officer of such church diocese, church or religious society, and employed under its authority and about its business; and every conveyance shall be valid which may hereafter be made, or has heretofore been made, of land as a location for a parish house or house for the meeting of societies or committees of the church or others for the transaction of business connected with the church or of land as a place of residence for the sexton of a church, provided such land lies adjacent to or near by the lot or land on which is situated the church to which it is designed to be appurtenant; or for use in furtherance of the affairs of any church diocese, and the land shall be held for such uses or benefit and for such purposes, and not otherwise.

14

religious congregation." (Emphasis added.) In this context, this Court has previously explained that the phrase "religious congregation" was limited, meaning "the local congregation rather than a larger hierarchical body." Norfolk Presbytery, 214 Va. at 506, 201 S.E.2d at 757.

However, in 1993, the General Assembly repealed Code § 57-7 and enacted Code § 57-7.1.[6] See 1993 Acts ch. 370. Unlike Code § 57-7, Code § 57-7.1 validates conveyances and transfers of both real and personal property "which [are] made to or for the benefit of any church, church diocese, religious congregation or religious society." (Emphasis added.) The General Assembly's inclusion of the phrase "church diocese" in Code § 57-7.1 clearly demonstrates its intention to broaden the scope of denominational trusts to include all real and personal property that is conveyed or transferred to or for the benefit of a hierarchical church. Indeed, we previously recognized that similar language in another portion of former Code § 57-7 "broadened the scope of [denominational] trusts to include property conveyed or devised for the use or benefit of a church

---

[6] Code § 57-7.1 states, in relevant part:
> Every conveyance or transfer of real or personal property, whether inter vivos or by will, which is made to or for the benefit of any church, church diocese, religious congregation or religious society, whether by purchase or gift, shall be valid.

15

diocese for certain residential purposes."  Norfolk Presbytery,

214 Va. at 506, 201 S.E.2d at 757-58.  Thus, notwithstanding

Virginia's long history of invalidating trusts for hierarchical

churches, the General Assembly has expressly allowed such trusts

with the passage of Code § 57-7.1.  Accordingly, we agree with

TEC and the Diocese and hold that the trial court erred in its

application of Code § 57-7.1.

### B. EXISTENCE OF A TRUST

Having determined that the property could be subject to a

denominational trust, we now examine what effect, if any, Code

§ 57-7.1 has on the present case.  TEC and the Diocese contend

that canon I.7.4 of TEC's canons (the "Dennis Canon")[7] created an

express trust in "[a]ll real and personal property held by or

for the benefit of any Parish, Mission or Congregation."  The

Dennis Canon was enacted by TEC's General Convention in 1979.

It was reportedly passed in direct response to the Supreme

---

[7] The Dennis Canon states:

> All real and personal property held by or
> for the benefit of any Parish, Mission or
> Congregation is held in trust for this
> Church and the Diocese thereof in which such
> Parish, Mission or Congregation is located.
> The existence of this trust, however, shall
> in no way limit the power and authority of
> the Parish, Mission or Congregation
> otherwise existing over such property so
> long as the particular Parish, Mission or
> Congregation remains a part of, and subject
> to, this Church and its Constitution and
> Canons.

16

Court's recognition that "the constitution of the general church can be made to recite an express trust in favor of the denominational church."  Jones, 443 U.S. at 606.

We have previously explained that, "unless the language shows a contrary intent, the language of an inter vivos trust should be construed according to the law in effect at the time the trust is executed."  McGehee v. Edwards, 268 Va. 15, 20, 597 S.E.2d 99, 102 (2004) (emphasis added); see also Yancey v. Scales, 244 Va. 300, 303, 421 S.E.2d 195, 196 (1992); Wildberger v. Cheek, 94 Va. 517, 520, 27 S.E. 441, 442 (1897).  In 1979, when the Dennis Canon was enacted, former Code § 57-7 was the law in effect.  Thus, any express trusts purportedly created by the Dennis Canon were ineffective in Virginia.

Our analysis does not end here, however.  Our holding in McGehee was clearly limited to express trusts.  Therefore, we next examine whether the property was subject to an implied trust.  Virginia has recognized two forms of implied trusts: resulting and constructive.  See Leonard v. Counts, 221 Va. 582, 588, 272 S.E.2d 190, 194 (1980) ("Resulting and constructive trusts comprise two categories of trusts by operation of law arising without any express declaration of trust.").  A resulting trust "arises when prior to the purchase one person binds himself to pay purchase money and stands behind his commitment, but title is conveyed to another."  Id. at 588, 272

S.E.2d at 195. It is readily apparent that the record in the present case does not support the existence of a resulting trust.

Constructive trusts, on the other hand, are trusts "which the law creates, independently of the intention of the parties, to prevent fraud or injustice." Id.

> Certain species of constructive trusts arise from actual fraud; many others spring from the violation of some positive fiduciary obligation; in all the remaining instances there is, latent perhaps, but none the less real, the necessary element of that unconscientious conduct which equity calls constructive fraud.

Porter v. Shaffer, 147 Va. 921, 929, 133 S.E. 614, 616 (1926) (citation and internal quotation marks omitted) (emphasis in original); see also Leonard, 221 Va. at 590, 272 S.E.2d at 196 ("'[N]ot . . . all constructive trusts are based on "fraud", unless that word is used in its broadest sense to include all conduct which equity treats as unfair, unconscionable and unjust'") (quoting George G. Bogert, The Law of Trusts and Trustees § 471, at 22-23 (2d ed. rev. 1978)).

Moreover,

> [i]t is well settled that where one person sustains a fiduciary relation to another he cannot acquire an interest in the subject matter of the relationship adverse to such other party. If he does so equity will regard him as a constructive trustee and compel him to convey to his associate a proper interest in the property or to

18

> account to him for the profits derived
> therefrom.

Horne v. Holley, 167 Va. 234, 240, 188 S.E. 169, 172 (1936).

Notably, constructive trusts "will not arise until explicitly created by a court."  David A. Thomas, 3 Thompson on Real Property § 27.04(g)(1)(i) (David A. Thomas, ed., 2d ed. 2001 & Supp. 2012).  A "court's action creating a constructive trust will relate back to the time when the property began to be wrongfully held."  Id.  As previously discussed, Code § 57-7.1 has been in effect since 1993, therefore it was the applicable law at all times the property in the present case is alleged to have been wrongfully held.

Thus, the existence of a constructive trust in the present case turns on the nature of the relationship between the parties.  To determine the nature of the relationship between a local congregation and a hierarchical church, we look to the articles of religious governance[8] of the hierarchical church as

---

[8] We recognize that, in previous church property disputes, we have only referenced the "constitution of the general church."  See Green, 221 Va. at 555, 272 S.E.2d at 185-86; Norfolk Presbytery, 214 Va. at 507, 201 S.E.2d at 758.  We note that limiting our examination to only the constitution of the general church is demonstrably unmanageable, given that each religion differs in its chosen form of religious governance.  Therefore, we interpret our previous references broadly to include any articles of religious governance employed by the general church.  Cf., Jones, 443 U.S. at 604 ("The neutral-principles method . . . requires a civil court to examine certain religious documents, such as a church constitution") (emphasis added).

19

well as the course of dealing between the local congregation and the hierarchical church.

## 1. ARTICLES OF RELIGIOUS GOVERNANCE

In the present case, we need look no further than the Dennis Canon to find sufficient evidence of the necessary fiduciary relationship. As a number of courts in other states have noted, the Dennis Canon "merely codified in explicit terms a trust relationship that has been implicit in the relationship between local parishes and dioceses since the founding of [TEC] in 1789." Rector, Wardens & Vestrymen of Trinity-St. Michael's Parish, Inc. v. Episcopal Church, 620 A.2d 1280, 1292 (Conn. 1993); see also Episcopal Diocese of Mass. v. DeVine, 797 N.E.2d 916, 924 n. 21 (Mass. App. Ct. 2003) ("the Dennis Canon merely confirmed the preexisting relationship between [TEC], its subordinate dioceses, and the parishes thereunder."); Trustees of the Diocese of Albany v. Trinity Episcopal Church, 684 N.Y.S.2d 76, 81 (N.Y. App. Div. 1999) ("the 'Dennis Canon' amendment expressly codifies a trust relationship which has implicitly existed between the local parishes and their dioceses throughout the history of the Protestant Episcopal Church."); Bishop & Diocese of Colorado v. Mote, 716 P.2d 85, 105 n. 15 (Colo. 1986) ("the [Dennis Canon] did nothing but confirm the relationships existing among [TEC], the diocese and the

parish"); <u>Protestant Episcopal Church in the Diocese of New Jersey v. Graves</u>, 417 A.2d 19, 24 (N.J. 1980) ("[The Dennis Canon] reflects established customs, practices and usages of The Protestant Episcopal Church.").

The Falls Church has argued in this case that it was not bound by the canons, including the Dennis Canon, as there is no evidence of mutual assent by The Falls Church with regard to TEC and the Diocese having any rights to the property. As this argument relates to the nature of the relationship between the parties, we will address it here.

We begin by observing that the relationship created by a local church's decision to join a hierarchical church is analogous to a contractual relationship. <u>See, e.g.</u>, <u>Norfolk Presbytery</u>, 214 Va. at 507, 201 S.E.2d at 758 (recognizing that courts are not "powerless to prevent a hierarchical church from being deprived of contractual rights in church property held by trustees of a local congregation").[9] Therefore, to determine the issue of mutual assent, we look exclusively to the "expressions

---

[9] We note that, although the relationship between a hierarchical church and a local church is analogous to a contractual relationship, we have never held, nor do we now hold, that all of the traditional concepts of contract law apply in the context of church property cases. By virtue of their relationship, the local church is clearly not an entirely independent entity. Indeed, the local church derives its identity from its relationship with the hierarchical church. Clearly, then, the parties are not negotiating at arm's length. As such, while some concepts of contract law apply to church property cases, others do not.

of [the parties'] intentions which are communicated between them." Lucy v. Zehmer, 196 Va. 493, 503, 84 S.E.2d 516, 522 (1954) (internal quotation marks omitted).  Here, the record clearly establishes that The Falls Church has affirmatively assented to the constitution and canons.  Upon joining TEC and the Diocese in 1836, The Falls Church agreed to "be benefited and bound . . . by every rule and canon which shall be framed, by any Convention acting under this constitution, for the government of this church in ecclesiastical concerns." Moreover, The Falls Church's Vestry Manual states "The Falls Church is subject to the constitution and canons of the national church ([TEC]) and of the Diocese."  (Emphasis added.)  Thus, contrary to its argument, it is clear that The Falls Church agreed to be bound by the constitutions and canons of both TEC and the Diocese.

Similarly, The Falls Church's argument that TEC and the Diocese acted in a unilateral manner in passing certain canons is without merit.  The record demonstrates that the adoption of the canons is hardly "unilateral."  The triennial General Convention, the highest governing body of TEC, adopts TEC's constitution and canons.  The General Convention is composed of representatives from each diocese.  The legislative body of each diocese (referred to in Virginia as the "Annual Council") selects the representatives that are sent to the General

22

Convention.  The Annual Council is composed of representatives from each of the churches and other congregations within the Diocese.  Thus, it is clear that each canon, including the Dennis Canon, is enacted through a process resembling a representative form of government.

Moreover, even if the implementation of the canons were unilateral, "religious freedom encompasses the 'power [of religious bodies] to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'"  Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 721-22 (1976) (quoting Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116 (1952)).  Thus, even if implementation of the Dennis Canon was unilateral, this Court would be powerless to address any issues of inequity wrought thereby, as to do so would involve judicial interference with religion and clearly violate the First Amendment.[10]

2. COURSE OF DEALING

---

[10] The Falls Church's assertion that Virginia law bars voluntary associations from enacting rules that encumber or forfeit member's property is inapposite to the present case. Notably, as previously stated, there was no "unilateral" encumbrance or forfeiture of the property in the present case analogous to the cases cited by The Falls Church.  Furthermore, the cases that The Falls Church relies upon deal with the limited remedies available under the Condominium Act, Code § 55-79.39, et seq., (Unit Owners Ass'n. v. Gillman, 223 Va. 752, 292 S.E.2d 378 (1982)) and the creation of private judicial tribunals that purport to have the power of the sovereign (Davis v. Mayo, 82 Va. 97 (1886)).

Turning to the course of dealing between the parties, the record clearly demonstrates that The Falls Church allowed the Diocese to play an active role in its overall operations. Indeed, the trial court found that on at least two occasions, the Diocese vetoed the employment of clergy at The Falls Church and The Falls Church complied with the decision; Bishops of the Diocese and other Bishops within TEC have visited The Falls Church every year between 1934 and 2005; and the vestry members of The Falls Church have regularly "subscribed to the oath or declaration prescribed by Diocesan Canons." It is worth noting that The Falls Church actively participated in the Diocese, having sent representatives to the Annual Convention every year for at least 100 years (1909-2010).

In conclusion, neither TEC nor the Diocese can claim a proprietary interest in the property by way of an express denominational trust. However, when one considers the constitution and canons, specifically the adoption of the Dennis Canon, and the course of dealing between the parties, The Falls Church, TEC and the Diocese intended, agreed and expected that the property at issue would be held in trust by The Falls Church as trustee for the benefit of TEC and the Diocese. As such, we find that the fiduciary relationship required to impose a constructive trust has been shown to exist. The fact that The Falls Church attempted to withdraw from TEC and the Diocese and

24

yet still maintain the property represents a violation of its fiduciary obligation to TEC and the Diocese.  Therefore, equity dictates that a constructive trust be imposed on the property for the benefit of TEC and the Diocese.

### III. PROPERTY AWARDS

In its remaining assignments of error, The Falls Church asserts that, notwithstanding the method of determining the ownership of the property, the trial court's property award was in error.  These arguments are independent of the trial court's application of the neutral-principles analysis and our constructive trust determination; therefore, we will address them.

### A. CONSTITUTIONALITY

In its second assignment or error, The Falls Church argues that "[t]he trial court's award of [The Falls Church's] property to [TEC and the Diocese] violates the Religion Clauses of the U.S. and Virginia Constitutions by enabling denominations to secure others' property by means available to no other Virginia entity."  The essence of The Falls Church's argument is that the method of resolving a property ownership dispute between a hierarchical church and a local church is unconstitutional.  In light of the fact that the trial court's analysis and the existence of denominational trusts rely on the application of neutral principles of law, which has been specifically upheld by

25

the United States Supreme Court in Jones, 443 U.S. at 602-03, we must disagree with The Falls Church. So long as the dispute was resolved in a wholly secular manner through the use of neutral principles of law, as it was in the present case, we cannot say that the trial court committed constitutional error.

## B. PROPERTY ACQUIRED BEFORE 1904

The Falls Church next takes issue with the trial court's finding that the Diocese and TEC "had proprietary interests in [The Falls Church's] real property acquired before 1904, when the legislature first referenced denominational approval of church property transfers." Specifically, The Falls Church argues that the trial court erred by "retroactively applying laws and canons not in force when [The Falls Church] acquired its initial property or when it joined the denomination." The Falls Church claims that the trial court ruled that the 1904 amendment to Code § 57-15 retroactively validated the consent canons, which were enacted in 1870 when TEC and the Diocese were incapable of holding any property. Thus, according to The Falls Church, it is only bound by the laws and canons in effect at the time it joined TEC and the Diocese.

In light of our above ruling, we no longer need to consider this issue, as this case is governed by Code § 57-7.1, not Code § 57-15. Assuming Code § 57-15 were applicable, however, we note that contrary to The Falls Church's argument, the trial

court did not hold that Code § 57-15 retroactively validated the consent canons. Rather, the trial court merely restated our holding in Norfolk Presbytery as to what must be determined before Code § 57-15 applies. Thus, nothing in the trial court's application of Code § 57-15 was retroactive.

Furthermore, The Falls Church's interpretation of Code § 57-15 ignores the plain language of The Diocesan Constitution in effect when The Falls Church joined the Diocese, which provided that The Falls Church agreed to be "benefited and bound . . . by every rule and canon which shall be framed." (Emphasis added.) Under The Falls Church's interpretation, it would only be bound by those rules and canons which "have been framed."[11] (Emphasis added.) Accordingly, we find no error in the trial court's application of Code § 57-15.

## C. UNCONSECRATED PROPERTY

The Falls Church next argues that the trial court erred in deciding to award the Diocese and TEC the unconsecrated property held by The Falls Church. According to The Falls Church, it was incorrect for the trial court to rely upon TEC's canons to determine ownership of unconsecrated real property. The Falls Church contends that the canons only apply to consecrated

---

[11] We further note that The Falls Church's application of Code § 57-15 would result in an unmanageable patchwork of laws and canons that would be different for each congregation and, potentially, each property.

27

property, therefore, it was improper for the trial court to apply them to any unconsecrated property. However, The Falls Church never raised this argument before the trial court and therefore we will not consider it here. See Rule 5:25 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling").

### D. PERSONAL PROPERTY

In its fifth assignment of error, The Falls Church argues that

> [t]he trial court erred in awarding [The Falls Church's] personal property to [TEC and the Diocese] - even though [TEC and the Diocese] never had any control over [The Falls Church's] funds or their use, and [The Falls Church's] donors, for religious reasons, gave on the express condition that their gifts not be forwarded to [TEC and the Diocese]- in violation of Va. Code § 57-1 and the Religion Clauses of the U.S. and Virginia Constitutions.

The Falls Church asserts that the trial court failed to require TEC to prove an interest in the personal property of The Falls Church. The Falls Church contends that the trial court ignored the evidence that its use of its funds was discretionary, as demonstrated by the fact that TEC had no enforcement system. Thus, according to The Falls Church, TEC had no dominion over the personal property of The Falls Church.

In making its ruling, the trial court relied exclusively on Code § 57-10, which states, in relevant part:

> When personal property shall be given or acquired for the benefit of an unincorporated church or religious body, to be used for its religious purposes, the same shall stand vested in the trustees having the legal title to the land, <u>to be held by them as the land is held, and upon the same trusts</u> . . . .

(Emphasis added.)

In light of our above ruling recognizing the existence of a constructive denominational trust, it is clear that any contributions or donations or payments of membership dues made to The Falls Church would also be held in trust for the benefit of TEC and the Diocese. Indeed, the existence of such a trust is further demonstrated when Code § 57-10 is considered in conjunction with Code § 57-7.1, because Code § 57-7.1 explicitly applies to "[e]very conveyance or transfer of real or <u>personal property</u>." (Emphasis added.) The fact that TEC and the Diocese grant each congregation discretion as to how it distributes any contributions or donations it receives does not change the fact that such contributions and donations are held in trust for the benefit of TEC and the Diocese.

The Falls Church further argues that the trial court failed to properly consider the donative intent of the congregants. The Falls Church relies on the fact that, starting in 2003, The

29

Falls Church's vestry decided it would no longer give money to TEC or the Diocese. The congregants were informed that they could contribute directly to TEC and the Diocese if they wished. According to The Falls Church, any contributions or donations made to The Falls Church after 2003 must be viewed as demonstrating the congregants' donative intent to support only The Falls Church and not TEC or the Diocese. The Diocese counters that The Falls Church can only prove donative intent by tracing the source of the donations and contributions to specific donors/contributors.

Based on the record before us, we cannot determine the donative intent of any individual member of the congregation, much less the congregation as a whole. The Falls Church offered no evidence, beyond the decision of the vestry, that provides any support for a finding about the donative intent of the congregants. It is further worth noting that, contrary to its stated decision, the vestry continued to give money to the Diocese, albeit for designated purposes as opposed to the Diocese's general operating budget. While we make no decision as to what level of evidence would sufficiently demonstrate the donative intent of the congregation as a whole, we hold that evidence merely documenting the policy of the vestry is insufficient. Indeed, the decision of the vestry only

30

establishes that it was exercising the discretion granted to it by TEC and the Diocese.

### E. RELIEF SOUGHT

In its final assignment of error, The Falls Church asserts that "[t]he trial court erred in awarding [TEC and the Diocese] more relief than sought, including funds given after [The Falls Church] disaffiliated and funds spent on maintenance, which [TEC and the Diocese] stipulated [The Falls Church] should keep." According to The Falls Church, the Diocese and TEC only sought the real and personal property The Falls Church acquired prior to disaffiliation. The trial court, however, ordered The Falls Church to turn over funds it acquired after it had disaffiliated from TEC and the Diocese.

In its letter opinion, the trial court identified four points in time which it considered as the potential demarcation point at which The Falls Church became an entirely separate entity from the Diocese and TEC: (1) when The Falls Church began withholding contributions to the Diocese; (2) when The Falls Church voted to disaffiliate; (3) when the Diocese declared that the property was abandoned; or (4) when the Diocese filed its declaratory judgment action. Ultimately, the trial court determined that the date that the Diocese filed its declaratory judgment action against The Falls Church was the proper demarcation point, explaining that "[a]fter this date, no

contribution made, no donation made, no dues paid by a congregant, could reasonably have been made with the understanding that the money was going to [an] Episcopal congregation[]."  This was error on the part of the trial court.

As we have previously indicated, The Falls Church's decision to withhold donations and contributions to the Diocese and TEC was clearly within The Falls Church's discretion and, ultimately, had no bearing on The Falls Church's standing as an Episcopal Church.  Similarly, the filing of the declaratory judgment action had no bearing on The Falls Church's standing as an Episcopal Church, as both parties had already taken affirmative steps that clearly indicated that The Falls Church was not an Episcopal Church: The Falls Church had voted to disaffiliate and the Diocese had declared that the CANA congregations had "severed ties with the Episcopal Church and the Diocese of Virginia."

Thus, the proper demarcation point is either when The Falls Church voted to disaffiliate or when the Diocese declared that the property was abandoned.  The trial court, in its letter opinion, correctly explained that once a congregation votes to disaffiliate from a hierarchical church, that congregation no longer has any rights or interest in any property owned by the

general church.[12]  A necessary corollary is that once a

congregation votes to disaffiliate from a hierarchical church,

the hierarchical church no longer has any rights or interest in

any property subsequently acquired by the congregation.[13]

Furthermore, as the trial court noted, the vote to

disaffiliate necessarily renders the Diocese's abandonment

declaration a nullity, as the declaration:

> did not "extinguish" the CANA Congregations'
> "interest" in the seven church properties,

---

[12] However, in its decision to eliminate this as the demarcation point, the trial court explained that:

> it is not the act of taking a vote, or even the filing of a petition, that renders a decision to affiliate with a different denomination final and conclusive – rather it is the Court's <u>approval</u> of the petition. That did not come until January 8, 2009, and in any event was reversed by the Virginia Supreme Court.

(Emphasis in original.)

This ruling expressly contradicts the trial court's earlier statement that the act of disaffiliation eliminated The Falls Church's interest in the property.  Additionally, nothing in our jurisprudence supports the notion that a congregation must receive court approval to disaffiliate.  Indeed, such a requirement would clearly amount to unconstitutional judicial interference.

[13] During the trial on the CANA Congregations' Code § 57-9 petitions and after both the Diocese and TEC had filed their declaratory judgment actions, counsel for TEC conceded that "the money that [the CANA Congregations have] received due to contributions since the time that they disaffiliated, and whatever purchases that they have made with that, the Episcopal Church and the Diocese haven't made a claim on that property."

> for the CANA Congregations are not in
> authorized possession of Episcopal church
> property and, therefore, have no "interest"
> in the properties capable of being
> extinguished.

(Emphasis in original.)

Therefore, we agree that the trial court awarded more relief than TEC and the Diocese sought. Accordingly, we will remand this issue to the trial court to reconsider its award using the date The Falls Church voted to disaffiliate as the proper demarcation point.

## IV. CONCLUSION

For the foregoing reasons we will reverse the judgment of the trial court with regard to its analysis of Code § 57-7.1 and find that TEC and the Diocese have proven that they have a proprietary interest and impose a constructive denominational trust in the properties. However, as the imposition of a constructive denominational trust still requires the conveyance of the property, we will affirm the trial court's order requiring that The Falls Church convey the property to TEC and the Diocese. With regard to the disposition of personal property acquired by The Falls Church after the vote to disaffiliate, we will reverse the judgment of the trial court and remand for further proceedings consistent with this opinion. We will affirm the remainder of the trial court's judgment.

Affirmed in part,

34

JUSTICE McCLANAHAN, concurring.

I agree with the majority as to its disposition of the property awards in section III.  I write separately as to the majority's neutral-principles analysis in section II, however, because I believe TEC and the Diocese acquired their interest in the disputed church property, not merely by a constructive trust, but rather by an express trust pursuant to the Dennis Canon, as TEC and the Diocese have consistently argued throughout this case.[1]

After holding that Virginia now allows trusts for hierarchical churches under Code § 57-7.1 (the successor to Code § 57-7), the majority states that "[i]n 1979, when the Dennis Canon was enacted, former Code § 57-7 was the law in effect. Thus, any express trusts purportedly created by the Dennis Canon were ineffective in Virginia." That statement necessarily assumes that former Code § 57-7 was constitutional as applied to

---

[1] Indeed, given the position of TEC and the Diocese on this issue both below and on appeal, I do not believe the question of whether the property is held by The Falls Church for TEC's and the Diocese's benefit through a constructive trust is before this Court.  See Rule 5:17(c); Commonwealth v. Brown, 279 Va. 235, 239-42, 687 S.E.2d 742, 743-45 (2010); Clifford v. Commonwealth, 274 Va. 23, 25-26, 645 S.E.2d 295, 297 (2007); Richardson v. Moore, 217 Va. 422, 423 n*, 229 S.E.2d 864, 865 n.* (1976).

the Dennis Canon.  In my opinion, that assumption is incorrect. Under First Amendment law, the prohibition of the enforcement of an express trust under former Code § 57-7, such as that created by the Dennis Canon between TEC, the Diocese, and The Falls Church, was unconstitutional.  Legislative recognition of the same no doubt resulted in the passage of Code § 57-7.1.  As Professor A. E. Dick Howard aptly states in his amicus brief in reference to the repeal of former Code § 57-7: "[t]he General Assembly has acted to sweep away that anachronistic and unconstitutional provision.  In enacting Section 57-7.1, the legislature has done what needed to be done."

Just because former Code § 57-7 was repealed in 1993 (and replaced with a constitutional provision) does not mean that the former statute was thereby rendered immune from future constitutional scrutiny, or that its constitutionality is moot. Given the potential dispositive impact of former Code § 57-7 on the issue of whether the disputed church property is being held in an express trust for the benefit of TEC and the Diocese pursuant to the Dennis Canon, as these parties assert, the statute's validity and effect is very much a live issue now before this Court.  See Wessely Energy Corp. v. Jennings, 736 S.W.2d 624, 625-28 (Tex. 1987) (In an action instituted in 1981, the Texas Supreme Court held that a coverture statute on title to real property repealed in 1963 was unconstitutional in 1954

36

when the subject deeds were executed, as the statute violated

both the United States and Texas Constitutions); Dunn v. Pate,

431 S.E.2d 178, 179-83 (N.C. 1993) (In an action instituted in

1989, the North Carolina Supreme Court held that private

examination statutes repealed in 1977 were unconstitutional in

1962 when the subject deed was executed, as the statutes

violated both the United States and North Carolina

Constitutions).

The manifest problem with former Code § 57-7,[2] as construed

and applied to hierarchical churches, was that it treated those

churches differently than local congregational churches[3] by

allowing only the latter to hold property in trust in Virginia.[4]

---

[2] Former Code § 57-7 provided, in relevant part, that "[e]very conveyance, devise, or dedication [of land] shall be valid [when done] for the use or benefit of any religious congregation."

[3] In this context, the term "local congregational church" is used in reference to an "autonomous congregation" at the local level not affiliated with a hierarchical church such as Episcopal and Presbyterian churches, which are "subject to control by super-congregational bodies." Protestant Episcopal Church v. Truro Church, 280 Va. 6, 13-14 n.4, 694 S.E.2d 555, 558 n.4 (2010) (citation and internal quotation marks omitted); see Norfolk Presbytery v. Bollinger, 214 Va. 500, 506-07, 201 S.E.2d 752, 757-58 (1974); Brooke v. Shacklett, 54 Va. (13 Gratt.) 301, 313 (1856).

[4] The only exception to this statutory exclusion on hierarchical churches was implemented by the 1962 amendment to former Code § 57-7, 1962 Acts ch. 516, which "broadened the scope of religious trusts to include property conveyed or devised for the use or benefit of a church diocese for certain residential purposes. The General Assembly [did] not go[] beyond

This was accomplished by use of Virginia's long-accepted but ultimately unconstitutional construction of the term "religious congregation" in former Code § 57-7 to mean only a local congregational church.  Virginia's historic animus toward the accumulation of wealth by churches generally, and hierarchical churches in particular, was the origin of that disparate statutory treatment.  See Norfolk Presbytery v. Bollinger, 214 Va. 500, 505-07, 201 S.E.2d 752, 757-58 (1974); Gallego v. Attorney General, 30 Va. (3 Leigh) 450, 477 (1832).

Such application of former Code § 57-7 violated the Establishment Clause of the First Amendment in conferring a religious preference to local congregational churches.  As a fundamental limitation of the Establishment Clause, neither a state nor the Federal Government "can pass laws which . . . prefer one religion over another."  Everson v. Board of Education, 330 U.S. 1, 15 (1947).  Since Everson, the United States Supreme Court "has adhered to th[is] principle, clearly manifested in the history and logic of the Establishment Clause."  Larson v. Valente, 456 U.S. 228, 246-55 (1982); see, e.g., id. at 246 (a state statute imposing registration and reporting requirements only on those religious organizations

this, however, to validate trusts for a general hierarchical church . . . ."  Norfolk Presbytery, 214 Va. at 506-507, 201 S.E.2d at 757-58 (citing Hoskinson v. Pusey, 73 Va. (32 Gratt.) 428, 431 (1879); Brooke, 54 Va. (13 Gratt) at 312-13)).

that solicited more than fifty percent of their funds from nonmembers worked a "denominational preference" in violation of the First Amendment); Fowler v. Rhode Island, 345 U.S. 67, 69-70 (1953) (holding that a municipal ordinance violated the First Amendment when applied to prohibit preaching in a public park by a Jehovah's Witness but to permit preaching during the course of a Catholic mass or Protestant church service). The Supreme Court has called this constitutionally mandated neutral treatment of religions "[t]he clearest command of the Establishment Clause." Larson, 456 U.S. at 244.

This command for government neutrality among religious groups or denominations was thus well established in the law when the United States Supreme Court decided Jones v. Wolf, 443 U.S. 595 (1979). In Jones, the Court addressed the question of how, consistent with the First Amendment, a state court may resolve a dispute between a hierarchical church and one of its local church affiliates over the ownership of church property. Id. at 597. In doing so, the Court directed that "[a]t any time before the dispute erupts" the parties could "ensure" a resolution of the matter by, inter alia, making the denomination's governing documents "recite an express trust in favor of the denominational church." Id. at 606. "[C]ivil courts will [then] be bound to give effect" to such provisions. Id.

Relying on Jones, TEC enacted the Dennis Canon at its 1979 General Convention (just months after Jones was decided). With this canon, TEC created an express trust for the benefit of it and its Dioceses as to all the property then being held by or for the benefit of its local parishes, missions and congregations, specifically providing, in relevant part: "All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for [TEC] and the Diocese thereof in which such Parish, Mission or Congregation is located."

Based on TEC's enactment of the Dennis Canon pursuant to the directive in Jones along with the neutrality rule dictated under the First Amendment, the express trust created by the Dennis Canon could not be invalidated under Virginia law by former Code § 57-7. Moreover, this Court is "bound to give effect" to this express trust under Jones. Id. at 606.

I would therefore hold that former Code § 57-7 was unconstitutional in its application to the Dennis Canon trust. That is to say the statute, as I read it, was not unconstitutional on its face. Rather, it was unconstitutional because of the historically restrictive construction and application given to the statutory term "religious congregation" so as to favor local "congregational churches" and disfavor "super congregational churches" like TEC and the Diocese. See

<u>Volkswagen of Am., Inc. v. Smit</u>, 279 Va. 327, 336, 689 S.E.2d 679, 684 (2010) ("Because our jurisprudence favors upholding the constitutionality of properly enacted laws, we have recognized that it is possible for a statute . . . to be facially valid, and yet unconstitutional as applied in a particular case."). Accordingly, the statute's prior application to other circumstances would remain unaffected by holding it unconstitutional as applied to trusts benefiting hierarchical churches.  <u>See</u> <u>Women's Med. Prof'l Corp. v. Voinovich</u>, 130 F.3d 187, 193 (6th Cir. 1997) (explaining that "[i]f a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances where it is not unconstitutional").

Having reached these conclusions, I would join the other courts that have determined that the Dennis Canon established an express trust for the benefit of TEC and its Dioceses in their respective states in the context of the nationwide church property dispute between TEC, its Dioceses and local Episcopal congregations.  <u>See</u> <u>Protestant Episcopal Church in the Diocese of Tennessee v. St. Andrew's Parish</u>, 2012 Tenn. App. LEXIS 274, at *35-41 (Tenn. Ct. App. 2012); <u>Episcopal Church in the Diocese of Conn. v. Gauss</u>, 28 A.3d 302, 318-28 (Conn. 2011); <u>Episcopal Church Cases</u>, 198 P.3d 66, 82 (Cal. 2009); <u>Episcopal Diocese of Rochester v. Harnish</u>, 899 N.E.2d 920, 922-25 (N.Y. 2008); <u>In re</u>

Church of St. James the Less, 888 A.2d 795, 807–10 (Pa. 2005);

Episcopal Diocese v. DeVine, 797 N.E.2d 916, 923–24 (Mass. 2003).

For these reasons, I concur.