## Richmond

## WESLEY J. GREEN, PASTOR, ET AL.

## V.

## TIMOTHY LEWIS, ET AL.

November 26, 1980.

Record No. 781388.

Present: All the Justices.

*David T. Balfour (Maloney, Yeatts, Balfour, Ayers & Barr,* on brief), for appellants.

*Lawrence D. Diehl (Spero and Diehl,* on brief), for appellees.

HARRISON, J., delivered the opinion of the Court.

We review an order of the lower court resolving a dispute between the congregation of Lee Chapel, African Methodist Episcopal Zion Church (A.M.E. Zion Church) on the one part and the general church on the other.[1] The court found that the general church had failed to establish that it had a proprietary interest in the property of Lee Chapel and decreed that the trustees of the local congregation and the congregation should enjoy the ownership, control, and use of

---

[1] Although the property involved here was conveyed to establish a church to be known as Lee's Chapel, the church is more frequently referred to as Lee Chapel and is so designated in this opinion.

the real and personal property in controversy to the exclusion of the general church.

The A.M.E. Zion church, organized in 1801 and reorganized in 1819, is Methodist Episcopal in belief. Its Virginia Conference was organized in 1866. The rules, regulations, and doctrines, governing and controlling the operation of the church are found in "The Doctrines and Discipline of the African Methodist Episcopal Zion Church," revised in May 1972, and hereinafter referred to as "the Discipline." It is a hierarchical church composed of local pastors, deacons, elders, presiding elders, and bishops, whose duties are specified in the Discipline. Periodic meetings are held, known as the General Conference, Annual Conference, District Conference, and Quarterly Conference.

The structure of the A.M.E. Zion Church and its general plan of operation are not unlike that of other supercongregational or hierarchical churches. It has a home mission department, makes grants and loans to local churches and has a publishing house in Charlotte, North Carolina, which provides literature for the local churches and Sunday Schools, and publishes the Discipline and hymnals. The Church operates an institute in Dinwiddie County, near Petersburg, Livingstone College in Salisbury, North Carolina, and two junior colleges, Clinton College in South Carolina, and Lomax-Hannon in Alabama. The Church makes scholarships available for students to attend these colleges. It also conducts Hood Seminary, a part of Livingstone College, to train its pastors. Missionary work is done by the church in three areas—Africa, the West Indies, and South America. The A.M.E. Zion Church is financed by assessments, called "general claims," which are paid by the members of the local churches to the "Connection," meaning the central or general church. Pastors are appointed by the bishops, and it was testified that a local congregation could not refuse to accept a pastor. Guidelines for worship are set forth in the Discipline and are followed by the various local pastors.

The real estate involved consists of a one acre lot in Chesterfield County, conveyed, by deed of Hector F. J. Dahl and Lucie H. Dahl, dated February 2, 1875, to the Trustees of the African Methodist Episcopal Church of Zion for the purpose of erecting an A.M.E. Church of Zion to be known as Lee Chapel. The church was constructed on the lot and thereafter continuously operated as an A.M.E. Zion Church until October 1977, when the controversy erupted that brought about this litigation. The original church building was destroyed by fire in 1939 and was replaced by the present building which

previously had been used and abandoned by the Pine Grove Methodist Church. All labor incident to the removal of the building to the Lee Chapel site was performed by the local membership. No funds of the A.M.E. Zion Church, state or national, were used incident to the reconstruction of the church or to pay for any improvements subsequently made thereon.

It is conceded that until October 1977, all pastors of Lee Chapel have been installed by the Annual Conference and their appointment accepted by the local congregation. The church owes no funds, assessments or other monies to the A.M.E. Zion Church or its Annual Conference.

On October 11, 1977, a meeting was held at Lee Chapel by a substantial majority of the membership of that church. At this meeting it was decided that Lee Chapel would separate itself from its parent organization, the A.M.E. Zion Church. Pursuant to this decision, the congregation, at a meeting held on November 20, 1977, adopted the following resolution:

RESOLVED:
1. That Lee's Chapel of the African Methodist Episcopal Zion Church, in accordance with the resolution of the members of its congregation adopted on October 11, 1977, shall become and it is so declared to be, by its members and congregation, an Independent Methodist Episcopal Church, to be known as Lee Chapel Methodist Episcopal Church, free from any affiliation with the African Methodist Episcopal Zion Church in Virginia; the African Methodist Episcopal Zion Church in America; the General, Annual and District Conferences of said church; and the Bishops, Elders, Pastors or other officers of said Church.
2. That all decisions concerning the Lee Chapel Methodist Episcopal Church and its property and all of its affairs shall be lawfully made by its local membership and congregation, through their duly elected officers or trustees.
3. That the local members and congregation, through their locally elected officers, shall endeavor to make, of their church, a House for the Worship of God, serving the religious needs of the people in their community, and, as a continuing Methodist Episcopal Church, will base their faith and belief in Jesus Christ as head of the Church and in the Bible as the Word of God and in the faith and practice of the Methodist Episcopal religion.

Thereafter, Wesley J. Green, pastor of Lee Chapel, sought an injunction against certain members of the church to prevent them from entering or using the premises of Lee Chapel in a manner contrary to the wishes of the proper officials of the A.M.E. Zion Church. The trial judge granted a temporary injunction which he subsequently dissolved on motion of the respondent members of the congregation who had petitioned to intervene.

There is little conflict in the evidence. Appellees do not deny that Lee Chapel has been an A.M.E. Zion Church and through the years has been a part of that hierarchical organization. There is no testimony that the original church was or was not formally dedicated. A member of the local congregation testified that the church building constructed from the old Pine Grove Methodist Church was never dedicated. The Reverend S. P. Spottswood, testifying about the differences between the A.M.E. Church and the A.M.E. Zion Church, said that they were both "independently autonomous," and that each had its own hierarchical structure. He said that both grew out of the Methodist Episcopal Church, that the Discipline of each was taken from the Methodist Church, and that the only difference was that in the A.M.E. Zion Church dedication of property was not required because it regarded a dedication as a ceremonial matter, more spiritual in nature than legal.

There was some difference of opinion as to the number of active members of Lee Chapel. The current pastor had a list of active and inactive members which contained approximately 150 names. A member of the church said that there were probably 70 active members of Lee Chapel and that 64 active members were present at the October 11, 1977 meeting when the congregation voted to withdraw from the general church.

Five members of the congregation testified and gave the background of their move to disassociate themselves from the A.M.E. Zion Church. The congregation of Lee Chapel became thoroughly disenchanted with the hierarchy, with the A.M.E. Zion Church, and with those who operated the church above the level of the congregation. They complained that the general church failed to lend any financial assistance during their remodeling program which cost approximately $12,000. They objected to the assessments which were levied and which the local congregation was required to meet. They claimed that their membership was not accurately reported to the parent organization and that the assessments were out of line, excessive, and beyond the financial ability of the congregation. Typical was the testimony of E. T.

Webster, who said he understood that the church and the property belonged to the people in the community, and that the affiliation with the A.M.E. Zion Church was an administrative type of affiliation, strictly for the purpose of supplying ministers for the congregation. Webster said that the benefits the central church now claim "all fade away when it comes down to getting any results from the affiliation. Only now they talk about what they can do, or what, you know, what they are doing, or what they want to do. Nothing before." He said that the local people were "just totally fed up with the conference" and that it was not a matter of how much money the assessment was or the benefits they had to offer, it was just a "total frustration" from having dealt with them previously. "They don't want anymore dealings with them."

The Reverend John A. Stringfield, Presiding Elder, testified that he recalled an occasion when a representative of Lee Chapel approached him for funds to make improvements and he said that "I stated that if the local church was in need of funds they could make an application for assistance, and that if they needed funds that they could make even the request to me and I would act and see that they got it." Stringfield said that to his knowledge the church never requested any financial assistance. He also testified to the manner in which the assessments were levied and how the amount assessed for each church was determined. He said that before the assessments were made representatives of both the clergy and the laity had "the opportunity to speak pro or con, to ask that it be changed, or whatever they want to ask about it. They have that privilege." He admitted to receiving some complaints from Lee Chapel about the assessments and the number of members that they were assessing in 1977.

It is clear that until October 1977, Lee Chapel operated in a manner not unlike the operation of any other small church located in a rural area serving a limited congregation and being a part of a hierarchical or supercongregational denomination. The frustrations experienced by the membership of Lee Chapel and the complaints they voice are not uncommon. However, it is not within the scope of this opinion to determine the validity of the grievances between the membership and the church. The issue is legal, not ecclesiastical, and involves an order of the court below, vesting title and ownership of the property in controversy in the trustees of the local congregation of Lee Chapel, upon the premise that the A.M.E. Zion Church has no proprietary interest therein.

It is well settled in Virginia that it is the right of a majority of

the members of a divided congregation to control the use of the church property if the church, in its organization and government, is a church or society entirely independent of any other church or general society. Code § 57-9; *Baber* v. *Caldwell,* 207 Va. 694, 695, 152 S.E.2d 23, 24 (1967). "We construe Code § 57-15 to require that a church property transfer may be ordered only upon a showing that this is the wish of the duly constituted church authorities having jurisdiction in the premises. . . . [The statute] now contemplates that the general church, or a division thereof, or certain ecclesiastical officials may be the proper parties to approve such a property transfer. In determining the proper party to approve the property transfer, the trial court must look to the organizational structure of the church." *Presbytery* v. *Grace Covenant Church,* 214 Va. 500, 502, 201 S.E.2d 752, 754-55 (1974). In both *Baber* v. *Caldwell, supra,* and *Presbytery* v. *Grace Covenant Church, supra,* we pointed out the distinctions, enunciated in Code § 57-9, between an autonomous congregation and one which is part of a supercongregational or hierarchical denomination where a determination of property rights is involved. We held that in the case of a supercongregational church Code § 57-15 "requires a showing that the property conveyance is the wish of the constituted authorities of the general church." *Presbytery, supra* at 503, 201 S.E.2d at 755.

Concerning the status of Lee Chapel, a reference to the original deed discloses that Lee Chapel has been an A.M.E. Zion Church for more than 100 years. The grantors conveyed the property to "Trustees of the A.M.E. Church of Zion." The conveyance was for the purpose of erecting an A.M.E. Church of Zion (to be known as Lee Chapel), not a church of some other denomination, or an independent church. And this is what occurred. The church was organized, the building was constructed, and it functioned as an A.M.E. Zion Church until October 1977. It became and was an integral part of the supercongregational or hierarchical structure of the A.M.E. Zion Church. The general church supplied the ministers and provided the organization and structure which is necessary if a church is to function and to fulfill its mission. A Sunday School was organized, and its materials were furnished by the general church. Hymnals and other literature were provided. Baptisms, marriages, and funerals were conducted from the church's Discipline. Revival services were held. The central church, of which Lee Chapel was a part, conducted world missions and sent missionaries abroad. Colleges were founded, scholarships provided, and loans and grants made available when, in the discretion of the general

church, they were needed. And the members of Lee Chapel, by payment of their assessments and in numerous other supportive ways, contributed to this state, national, and international ecclesiastical organization, and they presumably benefitted from the association, spiritually and otherwise.

The appellees say that the church, when rebuilt in 1939, was never formally dedicated and therefore the new structure never became an A.M.E. Zion Church. We disagree. Assuming that there never was a formal dedicatory ceremony following the conveyance in 1875, we conclude that 100 years of continuous services in the church by the pastors supplied Lee Chapel by the A.M.E. Zion Church constitutes an adequate dedication of the property for its intended spiritual and ecclesiastical purposes.

■ Appellees point to ¶433 of the Discipline which requires that a trust clause be incorporated in all conveyances of churches and parsonages to the A.M.E. Zion Church, providing that the property is held in trust for the national church, and they say that the 1875 deed involved here does not contain such a clause. However, when the conveyance was made in 1875 there was no rule or regulation in the Discipline of the church which required the inclusion of such a clause in the deed. Further, ¶434 of the Discipline expressly waives the requirement of a specific trust provision clause in deeds and conveyances executed prior to the adoption of the current Discipline.[2]

The addition of a trust clause to the deed would have provided the A.M.E. Zion Church with no additional or further interest in the Lee Chapel property. It was already held by the trustees for that church and no other. In *Presbytery* v. *Grace Covenant Church, supra,*

---

[2] Paragraph 434, Sec. 2, provides:

However, the absence of the trust clause stipulated in paragraph 433 and paragraph 434, Section 1, in deeds and conveyances previously executed, shall in no way exclude a local church from, or relieve it of, its African Methodist Episcopal Zion Church Connectional responsibilities. Nor shall it absolve a local congregation or board of trustees of its responsibility to the African Methodist Episcopal Zion Church, provided that the intent and desire of the founders and/or the later congregations and boards of Trustees is shown by any or all of the following indications: (a) the conveyance of the property to the trustees of the local African Methodist Episcopal Zion Church or any of its predecessors: (b) the use of the name, customs, and policy of the African Methodist Episcopal Zion Church in such a way as to be thus known to the community as a part of this denomination: (c) the acceptance of the pastorate of ministers appointed by a bishop of the African Methodist Episcopal Zion Church, or employed by the presiding elder of the district in which it is located.

we said: "As express trusts for supercongregational churches are invalid under Virginia law no implied trusts for such denominations may be upheld. But this does not mean that our civil courts are powerless to prevent a hierarchical church from being deprived of contractual rights in church property held by trustees of a local congregation." 214 Va. at 507, 201 S.E.2d at 758. There, we remanded the case to give the Norfolk Presbytery the opportunity to establish its "proprietary interest" in the property of Grace Covenant Church, an interest which could not be eliminated by the unilateral action of the congregation, and we said: "To this end the language of the deeds and the constitution of the general church should be considered by the trial court in the application of neutral principles of law." *Id.* We observed further that since the Norfolk Presbytery was prohibited by statute from relying on the implied trust theory it had the burden of proving a violation by the trustees of either "the express language of the deeds or a contractual obligation to the general church." *Id.*

In determining whether the A.M.E. Zion Church has a proprietary interest in the Lee Chapel property, we look to our own statutes, to the language of the deed conveying the property, to the constitution of the general church, and to the dealings between the parties. A proprietary right is a right customarily associated with ownership, title, and possession. It is an interest or a right of one who exercises dominion over a thing or property, of one who manages and controls. Here the A.M.E. Zion Church is the grantee in the deed, the property having been conveyed to trustees of that church to establish an A.M.E. Zion Church thereon. The provisions of this deed have remained unchanged since 1875, and since that time we find that the name, customs, and policies of the A.M.E. Zion Church have been used in such a way that Lee Chapel is known, recognized, and accepted to be an A.M.E. Zion Church. All religious services and ceremonies conducted by the pastors of that church have followed its Discipline. The literature used by the church and by the Sunday School came from the publishing house of the A.M.E. Zion Church. The various conferences to which the membership of Lee Chapel's congregation sent delegates were all organized and held under the direction of the A.M.E. Zion Church.

It is reasonable to assume that those who constituted the original membership of Lee Chapel, and who established the church in the manner directed by the grantors in the deed, and those members who followed thereafter, united themselves to a hierarchical church, the A.M.E. Zion Church, with the understanding and implied consent that

they and their church would be governed by and would adhere to the Discipline of the general church. And ¶437(1) of the Discipline requires that all property transfers be approved by the bishop.[3]

The fact that the general church has made no loans or grants for the benefit of Lee Chapel and that, in fact, it may have refused to contribute to the remodeling program of the local church, is not dispositive. A proprietary interest or a contractual obligation does not necessarily depend upon a monetary investment. The contractual obligation which the A.M.E. Zion Church assumed has its genesis in the 1875 deed. From that time until October 1977, when the congregation sought to disassociate itself from the general church, the A.M.E. Zion Church had assumed its responsibility, fulfilled its obligation, and exercised dominion, control, and supervision over Lee Chapel, albeit not always in accordance with the wishes of all the members of the local church.

We find from the language of the deed involved, the Discipline of the A.M.E. Zion Church, and the relationship which has existed between the central church and the congregation over a long period of years, that the A.M.E. Zion Church does have a proprietary interest in the property of Lee Chapel, and that its interest in the church property cannot be eliminated by the unilateral action of the congregation. The Discipline of the A.M.E. Zion Church requires that all property transfers be approved by the bishop of the district of the Annual Conference, and such approval has not been given.

We therefore reverse the order of the court below which purported to divest the A.M.E. Zion Church of its interest in the Lee Chapel property and to vest the ownership, control, use, and beneficial enjoyment of the property, and all incidents to ownership thereof, solely in the trustees of the local congregation of Lee Chapel.

*Reversed and final judgment.*

---

[3] Paragraph 437, Sec. 1, provides, in pertinent part:
The Trustees shall not in any case whatsoever dispose of Church Property by sale or otherwise without the consent of the majority of all the Members in Full Connection, expressed by vote in a meeting called for that purpose, of which due notice has been given. Provided, however, that no congregation, pastor, nor Trustee Board or agent of the congregation shall mortgage or sell any property of the African Methodist Episcopal Zion Church without the written consent of the bishop of the district or the Annual Conference.