Present:  Kinser, C.J., Lemons, Goodwyn, Millette, Mims, and
Powell, JJ., and Lacy, S.J.

AMERICAN TRADITION INSTITUTE,
ET AL.

v.    Record No. 130934    OPINION BY JUSTICE DONALD W. LEMONS
                                    April 17, 2014
RECTOR AND VISITORS OF THE
UNIVERSITY OF VIRGINIA, ET AL.

          FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                  Paul F. Sheridan, Judge Designate

     In this appeal, we consider whether the Circuit Court of

Prince William County ("trial court") erred by denying a

request for disclosure of certain documents under the Virginia

Freedom of Information Act ("VFOIA"), Code § 2.2-3700 et seq.,

and whether a public body may impose charges for the cost of

reviewing documents under the statutory exclusions.[1]

                    I.  Facts and Proceedings Below

     Dr. Michael Mann ("Professor Mann") is a climate

scientist and former professor at the University of Virginia

_____

     [1] Code § 2.2-3705.4 describes records that fall outside
the scope of VFOIA as "exclusions."  However, the introduction
to VFOIA describes documents falling outside the scope of
VFOIA as "exemptions": "Unless a public body or its officers
or employees specifically elect to exercise an exemption
provided by this chapter or any other statute, every meeting
shall be open to the public and all public records shall be
available for inspection and copying upon request. All public
records and meetings shall be presumed open, unless an
exemption is properly invoked."  See Code § 2.2-3700(B)
(emphasis added).  We conclude there is no practical
distinction between the use of the terms "exemption" and
"exclusion" within the context of VFOIA.  The Code, the
parties, the trial court, and this Court's prior decisions
have referred to "exclusion" and "exemption" interchangeably.

("UVA"), whose scholarly work has generated much scientific and political interest.[2]  On January 6, 2011, American Tradition Institute and Robert Marshall (collectively, "ATI") sent a request to UVA, a public university, seeking all of the documents that "Dr. Michael Mann produced and/or received while working for the University . . . and otherwise while using its facilities and resources . . . ."

Following ATI's January 6, 2011 request, UVA responded that it could not comply within the pre-set five-day compliance deadline under the VFOIA.  See Code § 2.2-3704(B).  ATI and UVA negotiated over a document production and fee schedule.  After multiple email exchanges, ATI and UVA agreed to a production schedule and a $2,000 deposit to defray costs.  On March 10, 2011, UVA received ATI's $2,000 deposit and began assessing its VFOIA request shortly thereafter.

On April 6, 2011, UVA sent ATI an email which read in part:

> I am writing to follow up on your
> Freedom of Information Act request of
> January 6, 2011, for a wide array of
> records and documents concerning former
> University of Virginia faculty member
> Michael Mann.  As I previously informed
> you, the University has identified 34,062
> potentially responsive documents on the

---

[2] This is the second lawsuit involving Professor Mann's research to reach this Court.  See Cuccinelli v. Rector & Visitors of the Univ. of Va., 283 Va. 420, 722 S.E.2d 626 (2012).

2

server we have previously agreed to be the sole repository of any possibly responsive material. We have now segregated from that mass of documents approximately 8,000 that are potentially responsive to your request and have been reviewing these documents for possible disclosure. As of today we have exhausted in this effort the initial payment you made. Consequently, we will undertake no further review unless you wish to pay another installment on our original estimate of $8,500.

To date we have reviewed approximately 1,000 of the roughly 8,000 documents potentially responsive to your request. I anticipate that a first group of responsive, non-exempt documents which may be lawfully disclosed will be released to you shortly.

On April 7, 2011, ATI complied with UVA's request and deposited additional funds so that the University would "continue [its] work to produce responsive documents." On April 29, 2011, UVA's associate general counsel indicated that the first set of documents would be available by May 6, 2011. However, ATI received no documents on that date so it filed a "Petition for Mandamus and Injunctive Relief" ("Petition") in the trial court. ATI's Petition asked the trial court to:

(1) [O]rder [UVA] to provide the requested documents on a timely schedule; (2) bar [UVA] from demanding payment for any costs other than "accessing, duplicating, supplying, or searching for the requested records"; (3) order the Parties to engage in a process that will minimize the number of excluded documents the Court will have to review in camera; (4) order payment of the Petitioners' reasonable costs associated with the instant matter; and

3

> (5) order such necessary and proper
> injunctive relief or other injunctive
> relief as this Court deems just and
> proper.

On May 24, 2011, the trial court entered an "Order on

Protection of Documents" which stated, in part:

> The Respondent [UVA] may designate as
> Exempt Information any requested public
> record.  Such designation shall constitute
> a representation to the Court that the
> Respondent . . . in good faith believes
> that the information so designated
> constitutes Exempt Information . . . .
> Respondent shall provide the Petitioners'
> [ATI] counsel . . . copies of all Exempt
> Information in a form to be agreed upon
> between the parties. . . .  The
> Petitioners shall have 90 days after
> receipt of the Exempt Information to
> review it, negotiate with the Respondents,
> and if they choose, file a petition with
> the Court for in camera review for
> determination as to whether the Respondent
> properly designated the records as Exempt
> Information as defined herein.[3]

In an accompanying order, the trial court also directed UVA to

release 1,793 emails "no later than 90 days after the date of

this order."

In June 2011, the trial court conducted a hearing on

whether UVA could charge ATI for the costs of reviewing the

---

[3] ATI's counsel was given access to all of the requested documents, so they could review the materials exclusively for the purpose of litigation.  The trial court expressly limited ATI's use of the documents to those purposes "necessary in connection with this action."  The trial court forbade ATI from "disclosing the [protected documents] to any other person or entity."

identified records according to the requirements of various statutory exemptions and limitations. After hearing oral argument the trial court entered an order holding that review of records sought pursuant to the Act to assure that the records are responsive, are not exempt from disclosure, and may be disclosed without violating other provisions of law is a necessary part of the process of "accessing, duplicating, supplying, or searching for the requested records" explicitly authorized by § 2.2-3704(F) and therefore represented a cost that may be imposed upon the requester under the VFOIA.

In September 2011, Professor Mann filed a motion to intervene, arguing that the University could not sufficiently protect his interests in privacy, academic freedom, and free speech. The trial court granted his motion on November 1, 2011.

Throughout 2012, the parties reviewed the requested documents and developed a series of exemplars for the trial court to review. UVA offered 14 exemplars. ATI proposed 17. On September 17, 2012 and April 2, 2013, the trial court conducted an in camera review of the exemplars and heard oral argument to determine whether the documents should be classified as exempt. The parties primarily disputed documents that may have been "proprietary." The significance of the dispute is highlighted by the use of the term in Code §

5

2.2-3705.4(4) which addresses certain public records that are exempt from disclosure.  To be exempt, the public record must be:

> Data, records or information of a proprietary nature produced or collected by or for faculty or staff of public institutions of higher education, other than the institutions' financial or administrative records, in the conduct of or as a result of study or research on medical, scientific, technical or scholarly issues, whether sponsored by the institution alone or in conjunction with a governmental body or a private concern, where such data, records or information has not been publicly released, published, copyrighted or patented.

Code § 2.2-3705.4(4).

UVA argued that the definition of "proprietary" applied in Green v. Lewis, 221 Va. 547, 555, 272 S.E.2d 181, 186 (1980), should be applied in the VFOIA context.  In Green we stated: "A proprietary right is a right customarily associated with ownership, title, and possession. It is an interest or a right of one who exercises dominion over a thing or property, of one who manages and controls."  Id.  In contrast, ATI argued that the General Assembly intended to equate "proprietary" with "competitive advantage."  In application, ATI limited its concept of competitive advantage to disclosures that would cause pecuniary harm.  The trial court

6

adopted UVA's position and applied the concept of "proprietary" discussed in Green.

After reviewing the exemplars and hearing oral argument, the trial court entered its final order on the Petition and held that:

> (1) Professor Mann's business correspondence was public record; but that his "purely personal correspondence not relating to public business" did not constitute a public record under VFOIA;
>
> (2) Professor Mann's emails were scientific and scholarly;
>
> (3) Professor Mann's emails were not "publicly released, published, copyrighted, or patented";[4]
>
> (4) the definition of "proprietary" in Code § 2.2-3705.4(4) means "a thing or property owned or in the possession of one who manages and controls them, in this case, the University . . . . The concept of commercial competitive advantage in [Code § 2.2-3705.6] does not modify the meaning of 'proprietary nature' within [Code § 2.2-3705.4(4)]"; and
>
> (5) the [e]xemplars were either personal emails not qualifying as public records or they met the requirements of the "proprietary research," "scholastic record" and "personnel record" exclusions.

The trial court upheld UVA's exclusion of Professor Mann's emails from production.

---

[4] Both parties agree that issues regarding copyright are not before this Court on appeal.

7

ATI noted its appeal to this Court, and we awarded an appeal on the following assignments of error:

1. The trial court erred in holding "of a proprietary nature" as used in [Code] § 2.2-3705.4(4) means "a thing or property owned or in the possession of one who manages and controls them."

2. The trial court erred in allowing [UVA] to demand payment for the cost of exclusion review of documents sought.

3. The trial court erred in finding UVA carried its burden of proof that the records withheld exclusively under [Code] § 2.2-3705.4(4) meet each of the requirements for exclusion.

## II. Analysis

### A. Standard of Review

Proper construction of the phrase "of a proprietary nature" under Code § 2.2-3705.4(4), and the determination whether Code § 2.2-3704(F) permits UVA to charge ATI for the costs associated with review of the documents under the statutory exemptions, are questions of law that are reviewed de novo. See Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104-05, 639 S.E.2d 174, 178 (2007). Whether documents of the types represented in the exemplars submitted to the court should be excluded under Code § 2.2-3705.4(4) is a mixed question of law and fact. See Napper v. ABM Janitorial Servs., 284 Va. 55, 61, 726 S.E.2d 313, 316 (2012). Therefore, "[w]e give deference to the trial court's factual findings and view the facts in the light most favorable to the

8

prevailing part[y,] but we review the trial court's application of the law to those facts de novo."  Tuttle v. Webb, 284 Va. 319, 324, 731 S.E.2d 909, 911 (2012)(quoting Caplan v. Bogard, 264 Va. 219, 225, 563 S.E.2d 719, 722 (2002)).

B. The Virginia Freedom of Information Act

VFOIA has existed, in one form or another, since 1968. Acts of Assembly, Ch. 479 (1968).  Its primary purpose is to facilitate openness in the administration of government.  Code § 2.2-3700(B) states:

> By enacting this chapter, the General Assembly ensures the people of the Commonwealth ready access to public records in the custody of a public body or its officers and employees, and free entry to meetings of public bodies wherein the business of the people is being conducted. The affairs of government are not intended to be conducted in an atmosphere of secrecy since at all times the public is to be the beneficiary of any action taken at any level of government. Unless a public body or its officers or employees specifically elect to exercise an exemption provided by this chapter or any other statute, every meeting shall be open to the public and all public records shall be available for inspection and copying upon request. All public records and meetings shall be presumed open, unless an exemption is properly invoked.

VFOIA also requires that "[t]he provisions of this chapter shall be liberally construed to promote an increased awareness by all persons of governmental activities and afford every

9

opportunity to citizens to witness the operations of government. Any exemption from public access to records or meetings shall be narrowly construed and no record shall be withheld or meeting closed to the public unless specifically made exempt pursuant to this chapter or other specific provision of law." Id. (Emphasis added). These governing principles guide our understanding of VFOIA's specific provisions.

There are general exemptions to disclosure contained in VFOIA. For example, a VFOIA request only applies to a "public body or its officers and employees." See Code § 2.2-3701. Similarly, VFOIA only applies to "public records in the custody of a public body."[5] Accordingly, all private records

_____

[5] Code § 2.2-3701 defines a public records as:

> [A]ll writings and recordings that consist of letters, words or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostatting, photography, magnetic impulse, optical or magneto-optical form, mechanical or electronic recording or other form of data compilation, however stored, and regardless of physical form or characteristics, prepared or owned by, or in the possession of a public body or its officers, employees or agents in the transaction of public business. Records that are not prepared for or used in the transaction of public business are not public records.

are exempt.  These general exemptions create the basic parameters for which documents may be requested and from whom.

In addition to these general exemptions, the VFOIA creates many specific exemptions.  One of these specific exemptions is found in Code § 2.2-3705.4 in a section entitled "[e]xclusions to application of chapter; educational records and certain records of educational institutions."  Code § 2.2-3705.4(4) is the primary subject of this dispute.

C.   Exemption from Disclosure Under Code § 2.2-3705.4(4)

Code § 2.2-3705.4(4) is a specific exemption which applies to VFOIA requests to public institutions of higher education.  The disputed language of the exemption provides in relevant part:

> The following records are excluded from the provisions of this chapter but may be disclosed by the custodian in his discretion, except where such disclosure is prohibited by law:
>
> . . . .
>
> 4. Data, records or information of a proprietary nature produced or collected by or for faculty or staff of public institutions of higher education, other than the institutions' financial or administrative records, in the conduct of or as a result of study or research on medical, scientific, technical or scholarly issues, whether sponsored by the institution alone or in conjunction with a governmental body or a private concern, where such data, records or information

11

                    has not been publicly released, published,
                    copyrighted or patented.

See Code § 2.2-3705.4(4)(emphasis added).

        ATI's first assignment of error focuses exclusively on

the trial court's construction of the statutory term

"information of a proprietary nature."  VFOIA contains no

definition of "proprietary" upon which we may rely.[6]  See Code

§ 2.2-3701.  Therefore, we must use accepted rules of

statutory construction to interpret the provisions of Code §

2.2-3705.4(4).

        We have repeatedly held that "[w]hen . . . a statute

contains no express definition of a term, the general rule of

statutory construction is to infer the legislature's intent

from the . . . language used."  Hubbard v. Henrico Ltd.

P'ship, 255 Va. 335, 340, 497 S.E.2d 335, 338 (1998); City of

Virginia Beach v. Flippen, 251 Va. 358, 362, 467 S.E.2d 471,

473-74 (1996).  When the legislature leaves a term undefined,

courts must "give [the term] its ordinary meaning, [taking

---

        [6] Statutes in some other states deal more explicitly with
disclosure of documents under Freedom of Information requests
tendered to public universities.  For example, the Nebraska
legislature excludes from disclosure all "[t]rade secrets,
academic and scientific research work which is in progress and
unpublished, and other proprietary or commercial information
which if released would give advantage to business competitors
and serve no public purpose."  Neb. Rev. Stat. § 84-712.05(3).
Similarly, Oklahoma's legislature has provided that "a public
body may keep confidential. . . : 1. any information related
to research, the disclosure of which could affect the conduct
or outcome of the research."  51 Okla. Stat. § 24A.19.

12

into account] the context in which it is used." Dep't of Taxation v. Orange-Madison Coop. Farm Serv., 220 Va. 655, 658, 261 S.E.2d 532, 533-34 (1980).

ATI argues that "information of a proprietary nature" is limited to that which gives the governmental body a commercial competitive advantage or, stated negatively, that Code § 2.2-3705.4(4) only protects those documents which, if disclosed, would financially injure UVA.[7] ATI's proposed construction of "proprietary" is too narrow.

In our 1980 decision, Green, we applied the ordinary meaning of "proprietary": "a right customarily associated with ownership, title, and possession. It is an interest or a right of one who exercises dominion over a thing or property, of one who manages and controls." 221 Va. at 555, 272 S.E.2d at 186. See also Falls Church v. Protestant Episcopal Church in the United States, 285 Va. 651, 740 S.E.2d 530 (2013). UVA advanced this definition at trial and continues to do so on appeal. Because VFOIA does not provide a definition of

---

[7] In its opening brief ATI argued: "It is one thing to own the secret recipe for Coke™ and entirely another to profit from that secret. UVA may have custody over any withheld emails containing data, records, and information, but a proprietary interest must rise from the data itself and not merely because UVA owns or controls either the email or the data within it." ATI also repeatedly likened Code § 2.2-3705.4(4)'s use of the term "proprietary" to other statutes which used the term "proprietary" in the context of trade secrets, competitive position, and financial harm.

"proprietary" and we have previously construed the ordinary meaning of that term, we hold that the trial court correctly applied <u>Green</u> in this case.

Defining the statutory term "information of a proprietary nature" is only one of the requirements for establishing the exemption. There are seven statutory requirements under Code § 2.2-3705.4(4). In order to exclude public records from disclosure under a VFOIA request, a public university or college must prove:

> (1) the request is for data, records or information;
>
> (2) such data, records, or information is of a proprietary nature;
>
> (3) such data, records, or information is produced or collected by or for faculty or staff of a public institution of higher education;
>
> (4) such data, records, or information is produced or collected in the conduct of or as a result of research on medical, scientific, technical, or scholarly issues, or as a result of such study or research;
>
> (5) such study or research is sponsored by the institution alone or in conjunction with a governmental body or a private concern;
>
> (6) such data, records, or information are not the institution's financial or administrative records; and

14

(7) such data, records, or information have not been publicly released, published, copyrighted or patented.

We reject ATI's narrow construction of financial competitive advantage as a definition of "proprietary" because it is not consistent with the General Assembly's intent to protect public universities and colleges from being placed at a competitive disadvantage in relation to private universities and colleges.  In the context of the higher education research exclusion, competitive disadvantage implicates not only financial injury, but also harm to university-wide research efforts, damage to faculty recruitment and retention, undermining of faculty expectations of privacy and confidentiality, and impairment of free thought and expression.  This broader notion of competitive disadvantage is the overarching principle guiding application of the exemption.

In this case, many noted scholars and academic administrators submitted affidavits attesting to the harmful impact disclosure would have in these circumstances.  John Simon, Vice President and Provost of UVA and former Vice-Provost of Duke University, stated that:

> If U.S. scientists at public institutions lose the ability to protect their communications with faculty at other institutions, their ability to collaborate will be gravely harmed.  The result will

15

be a loss of scientific and creative opportunities for faculty at institutions in states which have not established protections under state FOIAs for such communications. . . . For faculty at public institutions such as the University of Virginia, compelled disclosure of their unpublished thoughts, data, and personal scholarly communications would mean a fundamental disruption of the norms and expectations which have enabled research to flourish at the great public institutions for over a century . . . . Scientists at private institutions such as Duke, where I previously worked, that are not subject to state freedom of information statutes, will not feel that it is possible to continue collaborations with scientists at public institutions if doing [s]o means that every email or other written communication discussing data, preliminary results, drafts of papers, review of grant proposals, or other related activities is subject to public release under a state FOIA in contravention of scholarly norms and expectations of privacy and confidentiality. . . . Compelled disclosure [in this case] will also impair recruitment and retention of faculty . . . . I can state unequivocally that recruitment of faculty to an institution like the University of Virginia will be deeply harmed if such faculty must fear that their unpublished communications with the scientific collaborators and scholarly colleagues are subject to involuntary public disclosure.  We will also lose key faculty to recruitments from other institutions – such as Duke, if their continued work at University of Virginia will render their communications involuntarily public.

Because we do not attribute to the General Assembly an intention to disadvantage the Commonwealth's public

16

universities in comparison to private colleges and universities, we hold that the higher education research exemption's desired effect is to avoid competitive harm not limited to financial matters. The Green definition of "proprietary" is consistent with that goal. Therefore, the circuit court did not err in applying that definition.

## D. Sufficiency of the Evidence

Based on the record and our in camera review of the exemplars, we cannot say that the trial court's judgment that some of the exemplars were not public records and all of the other exemplars satisfied each of the exemption's requirements was plainly wrong or without evidence to support it.[8] Online Res. Corp. v. Lawlor, 285 Va. 40, 60, 736 S.E.2d 886, 897 (2013)(citing Atrium Unit Owners Ass'n v. King, 266 Va. 288, 293, 585 S.E.2d 545, 548 (2003)("A judgment should be reversed for insufficient evidence only if it is plainly wrong or without evidence to support it.") (internal quotation marks

---

[8] ATI argues that UVA waived Code § 2.2-3705.4(4)'s exclusion by releasing the documents to Dr. Mann in preparation for trial. Although ATI argues waiver, this assertion is actually a claim that UVA has not met its burden of proof. That the information has not been publicly released is a requirement of the exemption. Although the trial court stated that it was expressly reserving judgment on ATI's "waiver argument," it decided that the exemplars satisfied each of the requirements for exclusion. Based upon the facts of this case, we cannot say that the trial court's judgment finding that the exemplars were not publicly released was plainly wrong or without evidence to support it.

omitted)).  Viewing the facts in the light most favorable to UVA, the prevailing party below, we find that UVA produced sufficient evidence to meet each of the higher education research exemption's seven requirements.

E. Fees for Exclusion Review under VFOIA

While statutes implementing freedom of information procedures in some other states expressly address recovery of costs associated with review of the requested materials for production under various exceptions or exemptions,[9] Code § 2.2-3704(F) simply provides that, "[a] public body may make reasonable charges not to exceed its actual cost incurred in accessing, duplicating, supplying, or searching for requested records."  ATI and UVA dispute whether a public body may impose a charge for its study of the documents under the

---

[9] For example, Illinois expressly precludes recovery of review costs (5 Ill. Comp. Stat. 140/6(a) provides: "Each public body may charge fees reasonably calculated to reimburse its actual cost for reproducing and certifying public records and for the use, by any person, of the equipment of the public body to copy records. Such fees shall exclude the costs of any search for and review of the record, and shall not exceed the actual cost of reproduction and certification"), while Michigan expressly authorizes imposition of charges for examination and review, as well as redaction, of requested materials in light of statutory exemptions to be applied (Mich. Comp. Laws § 15.234(1) provides:"[a] public body may charge a fee for a public record search, the necessary copying of a public record for inspection, or for providing a copy of a public record." The fee must be "limited to actual mailing costs, and to the actual incremental cost of duplication or publication including labor, the cost of search, examination, review, and the deletion and separation of exempt from nonexempt information." Id.).

18

exclusion provisions of the VFOIA.  In its July 7, 2011 order, the trial court held:

> A public body such as the University may seek reimbursement for review of public records sought pursuant to the Act to assure that those records are responsive, are not exempt from disclosure, and may be disclosed without violating other provisions of law.  Such review is inherent in the process of "assessing, duplicating, supplying, or searching for the requested records" explicitly authorized by [Code] § 2.2-3704(F).  Respondent may seek reimbursement for this exclusion review from Petitioners.

We agree with the trial court.

Principles of statutory construction require us to construe the terms "accessing," "duplicating," "supplying" and "searching" according to their ordinary meaning.  See Nolte v. MT Tech. Enters., LLC, 284 Va. 80, 89-90, 726 S.E.2d 339, 344 (2012).  "Search" means: (1) "to look into or over carefully or thoroughly in an effort to find something"; or (2) "to uncover, find, or come to know by inquiry or scrutiny." Webster's Third New International Dictionary 2048 (1993).  In the context of Code § 2.2-3704(F), "searching" includes "inquiring or scrutinizing" whether a disputed document can be released under federal and state law.[10]  Therefore, the

---

[10] For example, Virginia law prohibits a public body from disclosing social security, credit card, debit card, bank account and driver's license numbers as part of a VFOIA request.  See Code § 2.2-3808.1.  Accordingly, the public body

19

ordinary meaning of "searching" in this statutory provision permits a public body to charge a reasonable fee for exclusion review.[11]

### III.  Conclusion

We will affirm the judgment of the trial court.

*Affirmed*.

JUSTICE MIMS, concurring.

I join the majority opinion because I believe it has reached the right result in this case.  However, mindful of our canons of construction, this concurrence is warranted.

Under one canon, we presume that the General Assembly is aware of how we construe the terms it used in a statute and

---

must search the documents and exclude any information that would be unlawful to disclose.  Public bodies may charge for this "search" or "review" process.

[11] Recovery of review costs is also permitted under the federal Freedom of Information Act See, e.g., Judicial Watch, Inc. v. Dep't of Justice, 365 F.3d 1108, 1126 (D.C. Cir. 2004)("Under FOIA, the Department is permitted to charge a reasonable fee for searching, copying, and reviewing its files."); OSHA Data/CIH, Inc. v. Dep't of Labor, 220 F.3d 153, 160-68 (3rd Cir. 2000) (review costs, including costs relating to the task of assessing possible competitive harm from disclosure of the requested records, were compensable).

that it acquiesces in such constructions unless it subsequently enacts a corrective amendment.  E.g., Manchester Oaks Homeowners Ass'n v. Batt, 284 Va. 409, 428, 732 S.E.2d 690, 702 (2012 (citing Barson v. Commonwealth, 284 Va. 67, 74, 726 S.E.2d 292, 296 (2012)).  Under another, we presume that when the General Assembly used a word in multiple places within the same statutory scheme, it intended the word to have the same meaning in each unless another meaning is expressly provided.  E.g., Eberhardt v. Fairfax County Emps. Ret. Sys. Board of Trs., 283 Va. 190, 195, 721 S.E.2d 524, 526 (2012) (citing Board of Supervisors v. Marshall, 215 Va. 756, 761–62, 214 S.E.2d 146, 150 (1975)).

While I believe the Court has accurately assessed the public policy underlying the legislature's enactment of Code § 2.2-3705.4(4), the exclusion at issue in this case, I observe that the word "proprietary" also occurs in Code §§ 2.2-3705.1(6), 2.2-3705.4(5), 2.2-3705.5(4) and (12), 2.2-3705.6 (1), (3), (7), (8), (9), (10), (12), (13), (14), (17), (18), (19), (21), (25), and (27).  I am not confident that the General Assembly intended the definition of "proprietary" we endorse today to apply equally to them all.  However, only

Code § 2.2-3705.1(6) provides an express definition clarifying legislative intent.[*]

The majority opinion rightly deals only with the case, and code section, presently before the Court.  However, I write separately to spotlight that the judicial canons of statutory construction will require us to extrapolate from this decision when we are called upon to decide future cases dealing with other code sections.  I fear that such extrapolations may cause us to diverge from the General Assembly's true intent in such cases, if it does not provide clarification soon.  "Proprietary" is susceptible to too many meanings to be used so broadly and so often in the Virginia Freedom of Information Act with no specific definition.

---

[*] In many of these provisions, "proprietary" appears alongside the terms "business-related" or "trade secrets." While these might otherwise be read to shed some light on the sense of "proprietary" the General Assembly intended in each instance, one canon of construction requires us to give effect to each term rather than consider them merely synonymous repetition.  See Newberry Station Homeowners Ass'n v. Board of Supervisors, 285 Va. 604, 615 n.5, 740 S.E.2d 548, 554 n.5 (2013) ("[I]t is a 'settled principle of statutory construction that every part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary.'") (quoting Brown v. Commonwealth, 284 Va. 538, 544, 733 S.E.2d 638, 641 (2012)); see also Simon v. Forer, 265 Va. 483, 490, 578 S.E.2d 792, 796 (2003) ("[W]e assume that the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words.  When the General Assembly uses two different terms in the same act, it is presumed to mean two different things.") (internal citations and quotation marks omitted).